# EXHIBIT 1

J. Christopher Jaczko (SBN 149317)
Jacob K. Poorman (SBN 262261)
PROCOPIO CORY HARGREAVES & SAVITCH LLP
12544 High Bluff Drive, Suite 400
San Diego, CA 92130
Telephone: (858) 720-6300
Facsimile: (619) 744-5418
Email: *chris.jaczko@procopio.com*
Email: *jacob.poorman@procopio.com*

David A. Perkins (SBN 131683)
PACIFIC STEEL GROUP
4805 Murphy Canyon Road
San Diego, CA 92123
Telephone: (858) 251-1100
Email: *dperkins@pacificsteelgroup.com*

*Attorneys for Plaintiff*
PACIFIC STEEL GROUP

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
**05/13/2022** at 01:50:45 PM
Clerk of the Superior Court
By Jimmy Siharath,Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

PACIFIC STEEL GROUP, a California corporation,

Plaintiff,

v.

CMC STEEL FABRICATORS, INC. dba CMC REBAR, a Texas corporation; CMC STEEL US, LLC, a Delaware limited liability company; CMC REBAR WEST, a Delaware general partnership; and DOES 1 through 10 inclusive.

Defendants.

Case No. 37-2022-00018273-CU-BT-CTL

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**

1) **Violation of California Unfair Practices Act, Cal. Bus. & Prof. Code § 17043;**
2) **Violation of California Unfair Practices Act, Cal. Bus. & Prof. Code § 17044; and**
3) **Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

**JURY TRIAL DEMANDED**

Plaintiff Pacific Steel Group ("Pacific Steel" or "Plaintiff") files this Complaint for permanent injunctive relief and damages or restitution against Defendants CMC Steel Fabricators, Inc. d/b/a CMC Rebar ("CMC Rebar"), CMC Steel US, LLC ("CMC Steel US") and CMC Rebar West ("CMC Rebar West") for violations of California unfair business practices act and unfair competition law and alleges as follows:

**INTRODUCTION**

1. This case is brought to remedy injuries to competition in the rebar industry as well as to Pacific Steel caused by the unconscionable, unfair and illegal conduct of CMC Rebar, a subsidiary of the multi-billion dollar, multi-national steel conglomerate Commercial Metals Company ("CMC") which—through both its own conduct and that of Gerdau Reinforcing Steel ("GRS"[1]) (whose equity CMC purchased through its subsidiaries CMC Rebar and CMC Steel US)—has for years priced its rebar Furnish-and-Install services below cost in an effort to harm competition and minimize Pacific Steel's growth, profitability, effectiveness, and efficiency. The result of Defendant's unlawful conduct has been and/or will be the suppression of competition and damage to Pacific Steel's business.

2. Pacific Steel is a San Diego-based rebar subcontractor founded in late 2014. In response to Pacific Steel's entry into the rebar Furnish-and-Install market, CMC Rebar and GRS began frequently offering their rebar Furnish-and-Install services below cost in order to stifle Pacific Steel's growth and profitability and to prevent Pacific Steel from achieving economies of scale, further investing in more efficient and effective operations, and becoming an even stronger competitor in the Furnish-and-Install market.

**PARTIES**

3. Plaintiff Pacific Steel is a California corporation incorporated on October 9, 2014, with its principal place of business in San Diego, California. Pacific Steel fabricates (or "furnishes") and installs rebar based on structural engineers' commercial construction plans using standard lengths of rebar purchased from steel mills. Pacific Steel was formed by a team of

---

[1] As alleged hereinbelow, GRS is now known as CMC Rebar West.

seasoned industry professionals who previously worked at Pacific Coast Steel, a California corporation which sold a controlling interest to Gerdau Ameristeel Corporation in 2006 and transferred full ownership to that entity in 2011. Pacific Steel purchases rebar from manufacturers like CMC and its various steel mill divisions/subsidiaries. Pacific Steel competes with CMC and its various Furnish-and-Install subsidiaries, including Defendants CMC Rebar, CMC Steel US and CMC Rebar West in the rebar Furnish-and-Install market.

4. CMC is a Delaware corporation founded in 1915 with its principal place of business in Irving, Texas. CMC is publicly traded on the New York Stock Exchange under the symbol "CMC" and is a component of the S&P 400. CMC is the largest manufacturer and among the largest fabricators of rebar in the United States. CMC currently operates nine rebar manufacturing mills and 62 fabrication facilities throughout the United States and is by far the largest rebar manufacturer in the United States. CMC is the parent company of Defendants CMC Rebar, CMC Steel US, LLC, and CMC Rebar West and together with these wholly-owned subsidiaries collectively comprise the largest supplier of rebar Furnish-and-Install services in the United States.

5. Defendant CMC Rebar is a Texas corporation with its principal place of business in Seguin, Texas, and with offices throughout the country, including in California. It is a competitor of Pacific Steel in the rebar Furnish-and-Install markets. CMC Rebar is a wholly-owned subsidiary of CMC and touts itself as the nation's leading rebar fabricator. As alleged hereinbelow, on information and belief, CMC Rebar is a general partner in Defendant CMC Rebar West.

6. Defendant CMC Steel US is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Irving, Texas. CMC Steel US is wholly-owned by CMC and, either directly or through its affiliates, manufactures and markets rebar and provides related services. On information and belief, CMC Steel US is a general partner in Defendant CMC Rebar West.

7. Defendant CMC Rebar West is a Delaware general partnership with its principal place of business in San Diego, California that competes with Pacific Steel in the Furnish-and-

Install market. Defendant CMC Rebar West is the successor to GRS. Until in or around 2019, the general partners of GRS were Gerdau Ameristeel US Inc. and Gerdau Ameristeel WC, Inc. In 2018, Defendants CMC Rebar and CMC Steel US acquired the partnership interests of the two general partners Gerdau Ameristeel US Inc. and Gerdau Ameristeel WC, Inc. and changed the partnership name from GRS to CMC Rebar West in 2019. On information and belief, on or around January 1, 2021, CMC Rebar West merged into Defendant CMC Rebar. As the successor-in-interest, CMC Rebar is liable for the below-cost pricing of GRS and CMC Rebar West as alleged below.

8. The true names or capacities, whether individual, corporate, associate or otherwise, of Defendants named and sued as DOES 1 through 10, inclusive, are unknown to Plaintiff. Plaintiff is informed and believes, and on that basis alleges, that each of these fictitiously named Defendants is in some way liable to Plaintiff on the causes of action stated below. Pursuant to California Code of Civil Procedure section 474, Plaintiff will seek leave to amend this Complaint when the true names of said fictitiously named Defendants may be ascertained.

9. Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned, each of the Defendants sued herein as DOES 1 through 10, inclusive, were the agents, servants, alter egos, and/or employees of the other Defendants, and each of them.

10. Whenever this Complaint refers to an act, deed, or transaction of any business entity, the allegation means that the business entity engaged in that act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

**RELATION BACK TO PRIOR FEDERAL COURT COMPLAINT**

11. The causes of action asserted herein were the subject of a federal court action filed on October 30, 2020, and entitled *Pacific Steel Group v. Commercial Metals Company, et al.,* United States District Court for the Northern District of California, Case No. 20-cv-07683-HSG. The court entered an order on April 26, 2022, declining to rule on the state court matters asserted herein for lack of supplemental jurisdiction and ordering the same dismissed without prejudice. This complaint and the claims asserted herein are entitled to relate back to the October 30, 2020

filing date of the federal court action for purposes of any applicable statute of limitations because they rest on the same general set of facts, refer to the same accident and injuries and refer to the same instrumentality as the complaint filed in the federal court action.

## JURISDICTION AND VENUE

12. This court has personal jurisdiction over the defendants, and each of them, because defendants maintain sufficient minimum contacts with the State of California and the causes of action for violations of California's Unfair Practices Act and Unfair Competition Law arise out of defendants' unlawful and unfair activities conducted within this State.

13. Venue is appropriate in this judicial district because Plaintiff's principal place of business is located in this judicial district, Defendants CMC Rebar and CMC Rebar West maintain an office in this judicial district and the harm suffered by Plaintiff as a result of Defendants' unconscionable, unfair and illegal conduct has occurred, at least in part, in this judicial district.

## FACTUAL ALLEGATIONS

### I. The Rebar Industry

14. Steel reinforcing bar or "rebar" is a steel bar used to reinforce concrete or masonry structures and add tensile strength. The most common type of rebar is carbon steel or "black rebar" which consists of hot-rolled round bars with heavy ridges or deformation patterns that assist in binding to the concrete or masonry. Coatings such as epoxy resin may also be applied to prevent corrosion in saltwater environments.

15. Domestic rebar is typically manufactured to meet American Society for Testing and Materials ("ASTM") standards and sold in industry-standard sizes, lengths, and grades throughout the United States.

16. Domestic rebar sizes are expressed in imperial units corresponding to the diameter of the bar in increments of 1/8 of an inch. For example, "#3" size rebar has a diameter of 3/8 of an inch. Standard rebar sizes typically range from #3 (3/8 of an inch in diameter) to #18 (18/8 or 2.26 inches in diameter).

17. Domestic rebar is typically sold in standard straight lengths of 20, 30, 40, or 60 feet, as well as in coils.

18. Domestic rebar is graded with designations expressed using the minimum yield strength of the bar in thousands of pounds per inch ("ksi" or "1000 psi"). For example, grade 60 rebar—the most common grade used in modern U.S. construction—has a minimum yield strength of 60 thousand pounds per inch. The most commonly manufactured grades in the U.S. are 60 and 75, although higher strength grades including 80 and 100 are also available.

19. The weight of rebar depends primarily on its diameter and length, ranging from approximately 0.4 pounds per linear foot for #3 rebar to 13.6 pounds per linear foot for #18 rebar.

20. The domestic rebar manufacturing markets are highly concentrated. The two largest suppliers, CMC and Nucor, currently account for 80% of rebar production nationally. *See* Fastmarkets AMM, "*CMC-Gerdau deal done; market impact murky,*" by Patrick Fitzgerald (Nov. 5, 2018). As CMC noted in its 2020 Form 10-K filed with the Securities & Exchange Commission, "[w]e produce a significant percentage of the total U.S. output of rebar and merchant bar. We also believe we are the largest manufacturer, and among the largest fabricators, of rebar in the U.S." CMC, Annual Report (Form 10-K) (Oct. 15, 2020), at 5.

21. Although rebar consumption dropped nationally in the immediate aftermath of the 2007-2008 financial crisis, rebar consumption in the United States—including in the West and California in particular—has since rebounded, with strong demand in recent years. *See* Concrete Reinforcing Steel Inst., *Domestic Reinforcing Bar Consumption* (June 2020).

22. Before it can be installed in construction projects to reinforce concrete, rebar must be cut and shaped according to an engineer's drawings. Such drawings often include an armature of bent and connected rebar that must be carefully manipulated by trained professionals called "fabricators."

23. Since bending steel can alter its strength, this work must be performed very carefully by skilled, experienced steelworkers in order to meet code requirements and avoid failure. Once created, another team of skilled professionals installs the furnished rebar edifice on site.

24. Thus, fabricators (*e.g.*, Pacific Steel and CMC Rebar) purchase stock rebar from manufacturers (*e.g.*, CMC), cut and bend the rebar at a fabrication plant per the engineer's plans,

and then deliver and install the fabricated rebar in construction projects.

25. Fabricators have large fixed costs including their fabrication plant and equipment. Thus, the closer to full capacity they can operate, the more efficient they are. The rebar that fabricators must purchase or produce internally makes up a substantial share of their variable costs. Thus, sourcing low-cost rebar is critical for fabricators being able to offer low prices and compete effectively.

26. Some larger rebar entities—including CMC and its chief competitor, Nucor—are vertically integrated (*i.e.*, they own both steel mills and fabrication facilities, and they employ labor forces to furnish and install fabricated rebar). Of the 4.4 million tons of steel shipped from CMC's mills in 2019, approximately 2.0 million tons were shipped to CMC's own fabrication facilities.

27. CMC's wholly-owned Furnish-and-Install subsidiary, CMC Rebar, "is the nation's leading concrete reinforcing steel fabricator. . . ." *See Rebar Fabrication*, CMC, https://www.cmc.com/en-us/what-we-do/america/fabrication/rebar-fabrication (last visited May 11, 2022). As of August 2020, CMC operated 67 steel fabrication facilities worldwide. CMC Annual Report (Form 10-K) (Oct. 15, 2020), at 4, 18. Five of those fabrication facilities were in California and provide Furnish-and-Install services. *See id.*

28. In an effort to hide its losses from analysts, several years ago CMC decided to consolidate the financial reporting of its west coast mills with their Furnish-and-Install business. By doing so, the high general and administrative costs of their Furnish-and-Install business was artificially blended with the low general and administrative costs of their mills. The general and administrative expenses attributed to the Furnish-and-Install business should be used to determine its profitability on sales made.

## II. Pacific Steel's Entry Into the Rebar Furnish-and-Install Markets and CMC's Response

29. Pacific Steel was formed in late 2014 and is a "Furnish-and-Install" reinforcing steel subcontractor, meaning it purchases regularly stocked rebar from mills owned by manufacturers, such as CMC, Nucor, and previously Gerdau, cuts and bends the rebar per a

structural engineer's drawings, and then transports the fabricated rebar and installs it in construction projects using its team of union ironworkers.

30. Pacific Steel was formed by seasoned steel industry professionals who previously worked at Pacific Coast Steel, a rebar company sold to Gerdau in 2006. Both CMC Rebar and GRS (now CMC Rebar West) viewed Pacific Steel as a potential market disrupter because of the quality and efficiency of its operations. Pacific Steel is a data driven company; that is, it regularly and timely collects and analyzes data from all aspects of its operations. As a fabricator, it has an innovative shop set-up, sets high standards of performance, ensures appropriate engagement by leadership, and rewards success. As an installer, Pacific Steel emphasizes pre-planning of work, sets high standards for performance, and rewards success. Pacific Steel's innovative and efficient operations and its high performance standards yield superior performance and lower costs.

31. In response to Pacific Steel's entry into the market, CMC Rebar and GRS both began aggressively bidding Furnish-and-Install rebar projects in a targeted way to prevent Pacific Steel from gaining a foothold in the market. These bids frequently were made below cost and served as loss leaders specifically designed and intended to divert projects away from Pacific Steel and prevent it from growing, achieving economies of scale, investing in even more efficient and effective operations, and gaining further efficiency and effectiveness as a competitor. An individual with direct knowledge of the matter has confirmed CMC's strategy of bidding below its costs for Furnish-and-Install rebar projects in both Southern California and Northern California. Despite a California construction boom and rising demand for rebar Furnish-and-Install services, CMC Rebar and GRS (including its successor, CMC Rebar West) have sustained heavy losses in their Furnish-and-Install businesses since at least 2017, due in large part to bidding below cost. CMC Rebar's and GRS's below-cost bidding has slowed Pacific Steel's growth and depressed its profits considerably.

32. For example, CMC Rebar bid below its Furnish-and-Install costs in July 2020 to win the contract to install 6,394 tons of fabricated rebar in a 44-story high rise project at 696 S. New Hampshire in Los Angeles, California. Pacific Steel's bid for the project was $11,395,000, which was sufficient to cover its costs, including overhead, and allowed for a modest net profit.

CMC Rebar's bid came in more than 5% lower than the competition. On information and belief, CMC Rebar bid this project below its costs.

33. As another example, CMC Rebar bid below its Furnish-and-Install costs in March 2021 to win the contract to install 4,925 tons of fabricated rebar in a 41-story high rise project at 800 South Broadway in San Diego, California. Pacific Steel's bid for the project was $10,795,000, which was sufficient to cover its costs, including overhead, and allowed for a modest net profit. CMC Rebar's bid came in approximately $600,000 lower. On information and belief, CMC Rebar bid this project below its costs.

34. Similarly, GRS bid below its Furnish-and-Install costs in November 2018 to win the contract to install 1,034 tons of fabricated rebar in the Hotel Del Coronado North Parking Structure. Pacific Steel's bid for the project was $2,237,000, which was sufficient to cover its costs, including overhead, and allowed for a modest net profit. GRS's bid came in approximately 8% lower. On information and belief, GRS bid this project below its costs.

35. CMC Rebar employees have admitted to engaging in bidding below profitable levels in other geographic areas. According to the sworn affidavit of Hantse Costas, a former sales manager at a CMC subsidiary who became Vice President of Sales for a Texas fabricator, FABco LLC:

> Over the last several years, I have become familiar with the Houston, Texas, and San Antonio, Texas, rebar fabrication markets and the current market rates within the industry. Based on my experience and knowledge of the winning bids of CMC in those areas, CMC's pricing in these markets over the last several months is directly below FABco's breakeven point. ***Additionally, based upon my previous work for and knowledge of CMC, I believe CMC's recent prices submitted on bids in the Houston and San Antonio markets are at a level so low that its Rebar Fabrication division in these two markets is not making a profit on these jobs.*** As a result of CMC's undercutting, FABco has recently experienced a significant drop in the amount of bids that it has been awarded. I have learned that CMC has won those bids. CMC's prices are also markedly below what is traditionally the customary range for the rebar fabrication markets in Houston and San Antonio.

Sworn Affidavit of Hantse Costas, *FABco, LLC v. CMC*, No. DC-16-09402 (Dallas Cnty., Aug. 3, 2016) at ¶ 4 (emphasis added).

36. The purpose behind CMC Rebar's below-cost bidding in the San Antonio and Houston markets was explained by another affidavit from a different former CMC employee, Adrian Cano, who was employed by CMC or its subsidiaries for over eight years, including as the Manager of Distribution for the Central Region. *See* Sworn Affidavit of Adrian Cano ["Cano Aff.], *FABco, LLC v. CMC* (Dallas Cnty., Aug. 3, 2016) at ¶ 2. According to Mr. Cano:

> By [February 2015], FABco was beginning to be viewed as a serious competitor of CMC in the Central Region because FABco was taking a significant amount of market share away from CMC and several key employees had defected to join FABco.
>
> *****
>
> In the first quarter of 2016, while I was a [CMC] Sales Manager focused on the Houston area, Andrew Houser, Director of Sales for Rebar Fabrication Central Region, instructed me and other sales agents to "take FABco out" if we were competing with FABco on a bid. Shortly thereafter, Andrew Houser left CMC and was replaced by Matt Schewe. Matt Schewe and Chris Stowers, Director of Operations for Rebar Fabrication Central Region, instructed me to do everything we can to undercut FABco's pricing. I was told that FABco would not be able to maintain operations if we undercut their pricing and that they would "go broke." Chris Stowers also informed me that he had "seen FABco's books" and knew that we could take them out and put them out of business.

*Id.* at ¶¶ 5, 10.

37. On information and belief, the FABco litigation against CMC resulted in a multi-million dollar settlement.

38. As these sworn affidavits evidence, CMC subsidiaries have engaged in below-cost bidding more than once in an attempt to extinguish or minimize competition from smaller fabricators that are poised to become more efficient and effective competitors.

## III. <u>CMC's Gerdau Acquisition</u>

39. In large part due to CMC Rebar's and GRS's below-cost bidding practices, some of the largest fabricators in the market were running into serious financial trouble and sustaining massive losses in 2017 and thereafter.

40. As a result of such losses, on January 2, 2018, CMC announced that it had entered into an agreement to acquire four steel mills (including one in Rancho Cucamonga, California)

and 33 rebar fabrication facilities across the United States from Gerdau S.A. and its subsidiaries (the "Gerdau Acquisition").[2] The Gerdau Acquisition resulted in a combination of two of the three largest vertically integrated rebar manufacturers and fabricators in the country.

41. The Gerdau Acquisition closed on November 5, 2018. Following this acquisition, CMC and its wholly-owned subsidiaries had seven mini mills (in Alabama, California, Florida, New Jersey, South Carolina, Tennessee, and Texas), two micro mills (in Arizona and Oklahoma), and one rolling mill (in Arkansas) throughout the United States. As touted by CMC in its 2019 annual report:

> With the completed acquisition of significant additional U.S. assets, fiscal 2019 was a truly transformative year for CMC. Through the acquisition, we have added 33 steel fabrication facilities, four steel mini mills, 2.7 million tons of capacity and 2,500 new colleagues to CMC. As a result, at the close of fiscal 2019, CMC had more than 60 fabrication facilities across the country and 10 U.S. steel mills.

CMC, *Ready to XL*, 2019 Annual Report, at 3.

42. The Gerdau Acquisition doubled the number of CMC's rebar fabrication plants and, immediately afterwards, CMC referred to itself "[a]s one of the largest rebar fabricators in the U.S." *Id.* at pg. 11. Today, CMC touts itself as "*the* United States' largest manufacturer and fabricator of steel reinforcing bar. . . ." *See Who is CMC?*, CMC, https://www.cmc.com/en-us/investors (last visited May 11, 2022) (emphasis added).

43. By the time the Gerdau Acquisition closed, despite a strong construction boom in California, other large fabricators also were running into financial trouble as a result of CMC Rebar's and GRS's below-cost pricing. Alamillo Rebar, Inc. ("Alamillo") was one such company. On February 4, 2019, Pacific Steel and Alamillo entered into a series of agreements whereby Pacific Steel agreed to complete Alamillo's backlog of work and purchased much of its rebar equipment and inventory.

---

[2] In particular, as noted above, Gerdau S.A.'s Furnish-and-Install business was conducted through a Delaware partnership, GRS, the two partners in which were Gerdau Ameristeel US Inc. ("GAUS") and Gerdau Ameristeel WC, Inc. ("GAWS"). As part of the Gerdau Acquisition, GAUS sold its interest in GRS to Defendant CMC Steel US and GAWC sold its interest in GRS to Defendant CMC Rebar.

44. A few months later, on June 24, 2019, Pacific Steel entered into a similar agreement with another rebar fabricator, Harris Rebar Northern California, Inc. ("Harris"), whereby Pacific Steel purchased most of Harris's rebar equipment and inventory. Harris, which was owned by Nucor, suffered diminished profits just like Alamillo despite the strong demand in California for rebar and Furnish-and-Install services created by the construction boom. Harris was yet another casualty of CMC Rebar's and GRS's below-cost bidding scheme. By the end of 2019, CMC Rebar's and GRS's below-cost pricing had eliminated or marginalized three of its four largest rebar Furnish-and-Install competitors.

**IV. <u>Harm to Competition and to Plaintiff.</u>**

45. CMC Rebar's and GRS's below-cost pricing in the rebar Furnish-and-Install market, as alleged above, reduced competition by, among other things, unlawfully taking sales from Pacific Steel, diminishing Pacific Steel's revenues, profits, and growth, and preventing Pacific Steel from investing further in more efficient and effective operations, and from realizing greater economies of scale. CMC Rebar's and GRS's below-cost pricing in the rebar Furnish-and-Install market also reduced competition by unlawfully taking sales from other market participants including, among others, Harris and Alamillo, diminishing their revenues, profits, and growth, and preventing them from investing further in more efficient and effective operations, and from realizing greater economies of scale.

46. Defendants' conduct as alleged herein has injured and/or will injure Pacific Steel in its business or property by denying sales and profits to Pacific Steel in the market for rebar Furnish-and-Install services, and by lowering the value of Pacific Steel's business.

**<u>FIRST CAUSE OF ACTION</u>**

**California Unfair Practices Act, Cal. Bus. & Prof. Code § 17043**
**(Against All Defendants)**

47. Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 46 of this Complaint.

48. Defendants CMC Rebar, CMC Rebar West and CMC Steel US (including through GRS) and Does 1 through 10, and each of them, are and/or have been for some time engaged in

the business of selling rebar Furnish-and-Install services within the State of California.

49. Defendants CMC Rebar, CMC Rebar West and CMC Steel US (including through GRS) and Does 1 through 10, and each of them, have sold rebar Furnish-and-Install services in California at a price less than their cost and with the purpose of injuring competitors and destroying competition in the rebar Furnish-and-Install market in violation of the California Unfair Practices Act, California Business & Professions Code § 17043.

50. Defendants CMC Rebar, CMC Rebar West and CMC Steel US (including through GRS) and Does 1 through 10, and each of them, were not only aware that its acts would injure Pacific Steel and/or destroy competition in the rebar Furnish-and-Install market, they engaged in below-cost sales for the purpose of injuring Pacific Steel or destroying competition.

51. As a result of these acts, Pacific Steel has been injured in the form of lost profits and diminished business value in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

**California Unfair Practices Act, Cal. Bus. & Prof. Code § 17044**
**(Against All Defendants)**

52. Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 51 of this Complaint.

53. Defendants CMC Rebar, CMC Rebar West and CMC Steel US (including through GRS) and Does 1 through 10, and each of them, are and/or have been for some time engaged in the business of selling rebar Furnish-and-Install services within the State of California.

54. Defendants CMC Rebar, CMC Rebar West and CMC Steel US (including through GRS) and Does 1 through 10, and each of them, have sold rebar Furnish-and-Install services in the State of California as a loss leader, such that the effect has been to divert trade from Pacific Steel or otherwise injure Pacific Steel specifically and competition generally, in violation of the California Unfair Practices Act, California Business & Professions Code § 17044.

55. Defendants CMC Rebar, CMC Rebar West and CMC Steel US (including through GRS) and Does 1 through 10, and each of them, were not only aware that its acts would divert trade from or otherwise injure Pacific Steel specifically and competition generally in the rebar

Furnish-and-Install market, it engaged in loss leader sales for the sole and express purpose of injuring Pacific Steel and competition.

56. As a result of these acts, Pacific Steel has been injured in the form of lost profits and diminished business value in an amount to be proved at trial.

**<u>THIRD CAUSE OF ACTION</u>**

**California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(Against All Defendants)**

57. Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 56 of this Complaint.

58. The conduct complained of herein—including below cost and loss leader sales of Defendants CMC Rebar, CMC Rebar West and CMC Steel US (including through GRS) and Does 1 through 10, and each of them—constitutes unlawful business practices in that they violate California's Unfair Trade Practices Act.

59. The anticompetitive behavior of Defendants CMC Rebar, CMC Rebar West and CMC Steel US (including through GRS) and Does 1 through 10, and each of them, as described above, is unfair, unconscionable, and unlawful, and in any event is a violation of the policy or spirit of the law because it significantly harms and threatens competition.

60. Defendants' anticompetitive behavior and unfair business practices are part of an ongoing practice, and any purported utility of their conduct is outweighed by the gravity of the consequences to Pacific Steel and competition.

61. Defendants' unfair, unconscionable, and unlawful business practices constitute unfair competition in violation of the Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq*.

62. As a result of Defendants' unlawful and/or unfair business practices, Pacific Steel has been and will be injured in its business and property through lost income and profits, increased costs, and diminished business value. In addition, Defendants, and each of them, have been unjustly enriched as a result of these same unlawful and/or unfair business practices through increased profits and Pacific Steel is entitled to restitution as a result thereof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests that, based on the verdict of the jury, the Court enter a judgment against Defendants, and each of them, which:

A. Adjudges and decrees that Defendants, and each of them, engaged in below-cost sales and/or loss leader sales in violation of California's Unfair Practices Act, California Business & Professions Code §§ 17043 and 17044;

B. Adjudges and decrees that Defendants, and each of them, engaged in unlawful and/or unfair business practices in violation of California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*;

C. Provides permanent injunctive relief preventing Defendants, and each of them, from continuing the unlawful acts described above;

D. Awards Plaintiff damages, as required by statute, or, alternatively, restitution, caused by Defendants' conduct;

E. Awards Plaintiff costs incurred in pursuing this action;

F. Awards pre-judgment and post-judgment interest at the maximum legal rate; and

G. Awards such other relief as the Court deems just and proper.

Dated: May 13, 2022

PROCOPIO CORY HARGREAVES
& SAVITCH LLP

By: /s/ J. Christopher Jaczko
J. Christopher Jaczko
Jacob K. Poorman

PACIFIC STEEL GROUP
David A. Perkins

*Attorneys for Plaintiff*
PACIFIC STEEL GROUP